UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF DYE, TAMMIE ERSKINE, PATRICK
HALL AND ERIC PERTTUNEN,                    Case No. 09-13048

        Plaintiffs,                      Honorable Nancy G. Edmunds

v.

OFFICE OF RACING COMMISSION, ET
AL,

        Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [47]**

In this civil rights action, brought pursuant to 42 U.S.C. § 1983, Plaintiffs allege that Defendants violated their First Amendment rights to free speech and association. In addition to money damages against Defendants Christine White and Gary Post in their individual capacities, Plaintiffs' Second Amended complaint sought declaratory and injunctive relief against Defendant Office of Racing Commission and Defendants Christine White and Gary Post in their official capacity as Racing Commissioner and Deputy Commissioner, respectively.

Earlier in this litigation, a Stipulated Order was entered dismissing with prejudice all claims asserted against Defendant Office of Racing Commission and against Defendant Christine White in her official capacity [20]. Also earlier in this litigation, this Court granted in part and denied in part the Defendants' motion to dismiss Plaintiffs' claims against Defendant Post in his official capacity seeking injunctive and declaratory relief. (2/25/10

Opin. & Order, Doc. No. 21.)  The Court dismissed Plaintiffs' official capacity claims against Defendant Post seeking injunctive relief in the form of reinstatement and seeking a declaration that his past actions of "limiting and terminating" Plaintiffs' employment violated their First Amendment rights.  (*Id.* at 9, 10.)  The Court did not dismiss Plaintiffs' official capacity claim for injunctive relief prohibiting Defendant Post from taking any future adverse employment actions against Plaintiffs because they have or are engaging in constitutionally protected First Amendment activity.  Because Defendant Post is no longer employed as the Deputy Racing Commissioner or in any State capacity (Post Dep. at 5-6), Plaintiffs' claims against him in his official capacity are DISMISSED as moot.  Accordingly, the sole remaining claims in this action consist of Plaintiffs' claims against Defendants White and Post in their individual capacity seeking money damages and attorney fees.  (*Id.* at ¶ 3.)


This matter is now before the Court on Defendants' motion, brought pursuant to Federal Rules of Civil Procedure 56, seeking to dismiss Plaintiffs' claims.  Defendants' motion for summary judgment is GRANTED because each Plaintiff failed to show that (1) he or she engaged in protected First Amendment activity; (2) suffered an adverse employment action; or (3) the existence of the required causal link between protected First Amendment activity and an adverse employment action.

I.    **Facts**

The facts giving rise to this lawsuit began in October 2005.

A.  **Michigan's Office of the Racing Commissioner**

At all times relevant to this lawsuit, Michigan's Office of the Racing Commissioner ("ORC") regulated the State's horse racing industry.  Michigan conducts three types of

2

horse racing – Harness, Thoroughbred, and Quarter Horse.

Harness races have been and currently are run at Sports Creek Raceway in Swartz Creek, Michigan; Northville Downs, Northville, Michigan; and Hazel Park, Hazel Park, Michigan.  Harness racing was also conducted at Jackson Harness Raceway in Jackson, Michigan until that track closed in 2008.  Harness racing meets run throughout the year, sometimes simultaneously at two harness tracks, with short breaks between race meets.

Thoroughbred and Quarter Horse racing is conducted at different tracks – Mt. Pleasant Meadows and Pinnacle Race Course – over a shorter, four to five month period of time, but simultaneously with Harness racing.  (Post Aff. ¶ 5.)

The race Stewards perform the regulatory, judging, and enforcement functions for horse racing in Michigan.  This includes the licensing of riders and drivers, the licensing of horses, supervising the races, conducting hearings, and imposing penalties.  (*Id.* at ¶ 7.) Race Stewards also judge races – including calling fouls, disqualifications, determining winners and places, and enforcing the applicable racing rules and regulations.  (Post Dep. at 50-53.)  Appeals of the Stewards' race rulings and regulatory decisions are handled by the Deputy Racing Commissioner.  (Post Aff. ¶ 7.)

Because of the specialized and intermittent nature of the Stewards' work, the ORC hired the racing Stewards as independent contractors pursuant to Michigan Civil Service Commission Rule 7 ("CSC Rule 7").  (Defs.' Mot., Ex. 14, CSC Rule 7.)  The terms and conditions of the Stewards' contracted services were and are governed by CSC Rule 7.

**B.  Parties**

Plaintiffs Jeff Dye, Tammie Erskine, Patrick Hall, and Eric Perttunen were all appointed to their positions as state stewards of racing by the Racing Commissioner.  (Pls.'

3

Am. Compl. ¶ 10.)  *See* Mich. Comp. Laws Ann. § 431.306(1) (providing that "[t]he racing commissioner shall appoint 2 deputy commissioners and 3 state stewards of racing as special deputies for each licensed race meeting in the state" and further providing that "[t]he racing commissioner shall employ other personnel as necessary for the administration of this act within the limits of the appropriations made by the legislature and subject to civil service rules.").

Patrick Hall was first appointed in March 17, 1980; Jeff Dye was first appointed on April 22, 1988; Eric O. Perttunen was first appointed on March 22, 1994; and Tammie Erskine was first appointed on August 22, 1999.  (Pls.' Am. Compl. ¶ 10.)  Plaintiffs were independent contractors – not Civil Service employees – and signed contracts that stated their positions and per diem pay rates.  Plaintiffs did not receive new contracts in 2009 or 2010.  Although their salaries are paid by the State of Michigan, Plaintiffs' status as "Special Personnel Service" precludes them from filing a grievance with the State's Civil Service Commission.  Two of the Plaintiffs have been terminated.  Plaintiff Dye was terminated on June 5, 2009, and Plaintiff Erskine was terminated on June 6, 2009.  (*Id.* at ¶¶ 14-16, 58; Erskine Dep. at 16-17.)  Plaintiff Hall retired in 2010.  Plaintiff Perttunen still works as a racing Steward for the Michigan Gaming Board.[1]  (Perttunen Dep. at 6.)

Defendant Christine White was appointed to the position of Acting Racing Commissioner in January 2005 by then-Governor Jennifer Granholm and was subsequently confirmed as the Racing Commissioner in October 2005 after Senate hearings.  She served in this role until July 3, 2009.  (White Dep. at 16, 20, 28-35.)  Before taking the job

---

[1]By executive order, then-Governor Granholm transferred the Office of Racing Commission to the Michigan Gaming Board.  (Perttunen Dep. at 6.)

4

as Racing Commissioner, Defendant White served as the Deputy Director for Policy in the Michigan Department of Agriculture.  (White Dep. at 17.)

Defendant Gary Post was first hired as a contract management consultant by Bob Kaserowski, the Human Resources Director for Michigan's Agriculture Department, in July of 2006.  Mr. Kaserowski knew Defendant Post when he was the Human Resource Director for the Michigan State Police and called him to see if he would be interested in interviewing people in the state racing industry and produce a report identifying issues in the industry and in the Office of the Racing Commission.  (Post Dep. at 16-17, 29-31.)  His contract assignment was completed in September 2006.  (Post Dep. at 16; Post Aff. ¶ 2.)

While he was employed in the consulting role, Post had White describe her relationship with the employees from a management perspective.  White told Post that the former Deputy Racing Commissioner, James Bowes, wanted her position but did not get the appointment; and when he did not, he was deliberate about stirring up opposition to her among the employees who remained loyal to Bowes even after he left the ORC.  White told Post that Bowes' conduct undermined support for her among the employees, including Plaintiffs Dye, Erskine, Hall, and Perttunen, as well as non-plaintiffs Richard Jewell, Pete O'Hare, Martin Vandevelde, Brian Brown, Celine Rutkowski, and May Hay.  White also accused Bowes of planting disinformation with legislators and others about her qualifications.  (Post Dep. at 43-44.)

While serving as a management consultant in 2006, Defendant Post found that the Office of Racing Commission lacked a credible investigative function, lacked accountability for decision making or timekeeping, and lacked management controls.  He determined that "[m]any of the aspects of good management practice were not in place," when Defendant

5

White took over the job.  So, the fact that White ran into opposition from ORC employees, "was entirely understandable."  (Post Dep. at 45).  The ORC employees who opposed Defendant White, articulated to Post that they had been intensely loyal to Jim Bowes and were still extremely disappointed that he did not get the Racing Commissioner job.  (Post Dep. at 46.)  Post also attributed some of the employees' opposition to White's "strong, assertive" managerial style.  (Post Dep. at 45.)

Defendant Post subsequently applied for and was appointed to the Deputy Racing Commissioner position and began working in that capacity on October 11, 2006.  (Post Dep. at 32-33; Post Aff. ¶ 8.)  In his capacity as Deputy Racing Commissioner, Post supervised the Steward staff.  Beginning in January 2007, his supervision included race meets, the hiring of Stewards, administering the regulatory appeal process within the ORC, providing input into the budget process, and assisting with the development of policy, among other assignments.  (Post Aff. ¶ 4.)

### C.  Plaintiffs' § 1983 Claims and Relief Sought

Plaintiffs claim that Defendants White and Post violated their First Amendment rights of free speech and association by retaliating against them because of their political speech in opposition to White's confirmation as Racing Commissioner in October 2005, in support of Richard DeVos's candidacy for Governor of Michigan in 2006, and their affiliation and/or association with the Republican Party.  (Pls.' Am. Compl. ¶¶ 20- 61.)  Specifically, Plaintiffs allege that Defendants retaliated against them when they took the following adverse employment actions:  (1) eliminated the Administrative Liaison Steward position held by Plaintiff Dye and returned Dye to the Harness Steward rotation, causing him to suffer a decrease in income, reduced work hours, and the loss of his State-provided car, cell phone

6

and other perks; (2) eliminated the practice of "banking" time outside the pay period in which work was performed; (3) required Plaintiffs to seek permission to work certain hours; (4) reversed their racing decisions; (5) refused to reimburse Plaintiffs for travel costs in connection with a bi-annual certification conference in November 2006 and 2008; (7) decreased their opportunity to work more days/hours; (7) refused to give Plaintiffs first choice to fill open Steward dates at other race tracks; (8) hired two Ohio residents as Thoroughbred Stewards rather than giving the work to Plaintiffs; (9) hired a Harness Steward in 2008 rather than giving the work to Plaintiffs; and (10) terminated Plaintiffs Dye and Erskine in June 2009.  (Pls.' 2d Am. Compl. ¶¶ 27-28, 30-33, 35, 40-41, 47-49, 58.)

## II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to

7

properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

The Court first clarifies what is not at issue in this case. Defendants concede that they are prohibited from retaliating against independent contractors like Plaintiffs for engaging in constitutionally protected First Amendment activity. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996). Moreover, Defendants do not argue that party affiliation was an acceptable requirement for the positions Plaintiffs held. They acknowledge that the

First Amendment prohibits them from taking an adverse employment action against Plaintiffs because they failed to support a particular candidate or because of their political affiliation. *See Elrod v. Burns*, 427 U.S. 347 (1976); *Summe v. Kenton Cnty. Clerk's Office*, 604 F.3d 257, 264-65 (6th Cir. 2010). Rather, Defendants argue that Plaintiffs cannot establish the essential elements of their § 1983 claim that Defendants retaliated against them for supporting Dick De Vos in his unsuccessful run for governor in November 2006, for opposing Defendant White's confirmation by the state senate as Racing Commissioner, and for affiliating themselves with the Republican Party.

### A.  General Principles

As the Sixth Circuit recently observed, "[t]he First Amendment prohibits retaliation by a public employer against an employee on the basis of certain instances of protected speech by the employee." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983) and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968)). In *Connick*, the Supreme Court "erected a dichotomy between citizens speaking on matters of public concern and employees speaking on matters only of personal interest, and laid out the analysis for both." *Id.* at 256. The *Connick* Court clarified that "when a public employee speaks not as a citizen on matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147.

### B.  Elements of Plaintiffs' Retaliation Claim and Burden Shifting

9

To establish a prima facie case of First Amendment retaliation under 42 U.S.C. § 1983, Plaintiffs must prove the following three elements:

> (1) that there was constitutionally-protected conduct; (2) an adverse action by defendants sufficient to deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between the first and second elements – that is, the adverse action was motivated at least in part by plaintiff's protected conduct. . . .   A plaintiff successfully demonstrates a causal connection between the adverse action and the protected conduct by offering direct or circumstantial evidence indicating that the protected conduct was a substantial or motivating factor behind the adverse action against plaintiff.

*Eckerman v. Tenn. Dep't of Safety*, ___ F.3d ___, 2010 WL 5140625, at *4 (6th Cir. Dec. 20, 2010).

If Plaintiffs establish their prima facie case, "the burden shifts to defendants to 'prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'"  *Id.* (quoting *Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 431 (6th Cir. 2000)).  "Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant."  *Id.*  "Unlike the burden-shifting analysis in Title VII cases, if the defendants meet their burden, the burden does not shift back to plaintiff to show pretext."  *Id.* at n.4.

### C. Parties' Arguments

In their Amended Complaint, Plaintiffs allege that, beginning after the gubernatorial election of November 2006, Defendants engaged in a course of retaliation against them because of their "political speech" – their endorsement of the unsuccessful 2006 Republican candidate Dick DeVos and their opposition to Defendant White during her

10

confirmation because she had been appointed by a Democrat – and their political affiliation was with the Republican Party. (Pls.' 2d Am. Compl. ¶¶ 20-22, 34-40, 60-61.) In their Response, Plaintiffs argue that, even if they had not engaged in protected speech, their First Amendment rights were nonetheless violated because Defendants retaliated against them based on (1) their perception that Plaintiffs had done so; and (2) their knowledge that Plaintiffs had affiliated themselves with the Republican Party. Plaintiffs' rely on case law recognizing that "[p]olitical affiliation generally is not a constitutionally permissible ground for state employment decisions . . . ." *Eckerman*, ___ F.3d at ___, 2010 WL 5140625 at *4.

Defendants argue that Plaintiffs cannot establish that (1) they in fact engaged in any protected First Amendment activity; (2) Defendants' perceptions are enough to establish a First Amendment retaliation claim; (3) even if they were, Plaintiffs cannot establish that Defendants' perceptions of Plaintiffs' political speech or affiliation were a substantial or motivating factor for any of the alleged adverse employment actions; and (4) even if Plaintiffs can satisfy their burden of establishing the essential elements of their retaliation claim, they cannot overcome the fact that Defendants present evidence proving that the challenged employment decisions would have been the same absent the perceived constitutionally-protected First Amendment conduct.

This Court first addresses Plaintiffs' political speech claims.

**D. Did Plaintiffs Engage in Protected First Amendment Activity**

**1. Protected Speech**

Viewing the evidence in this light most favorable to Plaintiffs, some engaged in

constitutionally protected speech and some did not.

> A two prong test exists to determine if speech made by public employees is protected by the First Amendment. The threshold question is whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If it does relate to a matter of public concern, the court employs the balancing test outlined in *Pickering v. Board of Education*, 391 U.S. 563 (1968) . . . . If the speech relates only to a matter of private concern, it is not protected and the balancing test need not be applied.

*Mills v. Williams*, 476 F. Supp. 2d 653, 660 (E.D. Mich. 2007) (internal quotation marks and citations omitted), *aff'd*, 476 F. App'x 417 (6th Cir. 2008).

### a.  Speech Regarding Support for DeVos in 2006 Governor's Election

Plaintiffs argue that they were retaliated against because in the Fall of 2006 they voiced their support for the Republican candidate, Dick DeVos, in the 2006 gubernatorial election. Plaintiffs Perttunen and Erskine, however, deny that they ever told Defendants that they supported DeVos in the 2006 governor's election.

Specifically, Plaintiff Eric Perttunen denies that he ever told Defendants White or Post or anyone one else at work that he was supporting or had supported DeVos and denies that he ever told anyone else to support DeVos. He also testified that he may have had discussions with the other Stewards about who would be a better gubernatorial candidate for the racing industry to survive, but he did not recall the details of any such conversation. He further testified that he had mixed feelings about both the Republican and Democratic candidate, did not favor one side over the other, and did not care for either. (Perttunen Dep. at 53-54, 56.) Perttunen also denied that he did, in fact, support DeVos in the 2006 governor's election and testified that "Politics don't interest me." (*Id.* at 58-59,113.)

12

Perttunen also testified that, although Defendant Post did mention to him and two other Stewards – not Dye or Erskine[2] – that Granholm was the way for "us" to go and that DeVos was a bad choice for "us," Perttunen denied that Post ever told him to vote for Granholm for governor in 2006 or that he expected Perttunen or the other Stewards to vote for Granholm.  (Perttunen Dep. at 55, 61-64.)

Erskine testified that, although she and Defendant Post discussed the candidates generally, and Post talked about Granholm being the way to go if the horsemen felt they could get the slot machines to help them to pick up better purses and stated his opinion that Granholm's positions were better for the racing industry, she never told Defendants White or Post her political views or who she supported in the 2006 governor's race. (Erskine Dep. at 107-09.)  Erskine also testified that, at a January 4, 2007 Harness Steward meeting at Sports Creek, she denied to Defendants White and Post that she ever told anybody to vote for DeVos in the 2006 governor's election.  (*Id.* at 109.)[3]

Accordingly, even viewing the evidence in the light most favorable to them, Plaintiffs Perttunen and Erskine cannot establish that they engaged in protected First Amendment speech with regard to the 2006 governor's election.  There is evidence, however, that Plaintiffs Hall and Dye may have done so.

Plaintiff Hall testified that about two weeks before the 2006 gubernatorial election,

---

[2]Perttunen testified that he later told Dye and Erskine about this conversation. (Perttunen Dep. at 55, 61-62.)

[3]Erskine further testified that, at that January 4, 2007 meeting, when Defendant White accused the Harness Stewards of telling people to vote for DeVos, Defendant White's concern was that the Harness Stewards were trying to get rid of her as the Racing Commission.  (Erskine Dep. at 109-110.)

Defendant Post stated in front of him and Plaintiff Perttunen that it would be in "our" best interest to vote for Granholm.  Hall did not know what Post meant by "in our best interest," and he did not ask him what he meant.  Hall concedes that Post could have meant the racing industry.  (Hall Dep. at 112-13.)  Despite this conversation and Hall's admission that he privately endorsed DeVos and had contributed money to his campaign, he denies that he ever told Defendants Post or White any of this.[4]  (Hall Dep. at 61-62, 120-121, 122.)  Defendant White, however, testified that she was aware that Hall supported DeVos in the 2006 governor's election because she had received complaints from the horsemen that Plaintiff Hall, while on duty as a Harness Steward, had been campaigning with licensees that the ORC regulated, urging them to vote for DeVos.  The horsemen reported to Defendant White that they had talked to Plaintiff Hall about this; and, because she heard no more complaints, White assumed that it had stopped.  (White Dep. at 83-86.)

Defendant White also testified that Hall's conduct was discussed at the January 4, 2007 meeting with the Harness Stewards at Sports Creek Raceway.  She testified that, at that meeting, the only thing about Plaintiffs' support for DeVos that was mentioned was that she had heard that Plaintiff Hall was making comments while on duty to people that the ORC regulated, and she told the Harness Stewards that this sort of conduct was not allowed.  She told them, in so many words, that they could campaign all they wanted or support anyone they wanted outside of duty time.  Basically, she said that she did not have

---

[4]Hall further testified that, although he has occasionally supported other candidates and made other political contributions, he has never discussed it with his supervisors.  (Hall Dep. at 130-33, 135.)  He also testified that he did not know for certain who any of the other Harness Stewards supported for governor in the 2006 governor's race.  (*Id.* at 90-93.)

the ability to affect what they did on their personal time.  She denies that she discussed the

2006 governor's election or political favoritism or Plaintiffs' perceived political support for

a Republican candidate.  Rather, she testified, the only thing she talked about was the

incident with Plaintiff Hall.[5]  (White Dep. at 88-89.)

Finally, as to Plaintiff Dye, although he denies that he ever told Defendants Post or

White that he actually supported DeVos or did anything else that would show them that he

supported DeVos, Dye did tell Defendants Post and White, during informal discussions in

the ORC offices, that he believed DeVos was the better candidate because he was a

Republican and a business man and the State needed a business person.  (Dye Dep. at

---

[5]Defendant White's affidavit is consistent with her deposition testimony.  At her deposition, White testified that she was never at a meeting where the candidates for the 2006 governor's race were discussed.  (White Dep. at 83.)  She denied ever accusing the Plaintiffs of showing favoritism towards political candidates and telling them that that would affect their jobs.  (White Dep. at 88.)  She admits, however, that at the January 4, 2007 Sports Creek Raceway meeting, she did bring up the fact that she had heard about Plaintiff Hall making comments urging support for DeVos for governor while on duty to people that the ORC regulated, and White told all the Harness Stewards that that was not allowed. She did, however, tell them that they could campaign all they want or support anyone they wanted outside of duty time.  (White Dep. at 89.)

In her affidavit, Defendant White further avers that she never inquired of any employee what their political preferences were or which political candidate they may have been supporting.  (White Aff. ¶ 3.)  In response to speculation in Celine Rutkowski's Affidavit, Defendant White avers that she never asked any employee, including Janssen, to speak to other Racing Commission employees about their political preferences or which candidate they may be supporting.  (Defs.'s Reply, Ex. 15, White Aff. ¶ 4.)  Moreover, during the employment of non-plaintiff Celine Rutkowski, an executive secretary at the ORC, White admits that she learned that Rutkowski supported DeVos only because she placed a bumper sticker for DeVos in her work area.  White further avers, however, that she never spoke with Ms. Rutkowski about this matter and simply chose to ignore the presence of the sticker.  (White Aff. ¶ 3.)  Rutkowski's Affidavit does not dispute this.  (Pls.' Mot. to Supplement, Rutkowski Aff.)

35-36, 41-42, 53-54.)  Dye volunteered this information in response to Defendant Post's statement that he believed Granholm was the way to go; that she was better for the racing industry.[6]  (*Id.*)  It is reasonable to infer from this evidence that Defendants Post and White were aware of Plaintiff Dye's support for DeVos in the 2006 governor's election.

Because Plaintiffs Dye's and Hall's speech regarding which candidate they supported in the 2006 governor's election constitutes speech on a matter of public concern, the *Pickering* balancing test is applied.  *See Scarbrough*, 470 F.3d at 256 (defining matters of public concern to "include speech that relates to any matter of political, social, or other concern to the community.").  In applying the *Pickering* balancing test, the Court considers whether Plaintiffs' "interest in engaging in such speech outweighs the [defendant]'s interest in promoting the efficiency of the public services it performs through its employees."  *Id.* at 257 (internal quotation marks and citation omitted).  As the *Scarbrough* court explained, "[i]n performing the *Pickering* balancing test, the speech will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose.  Pertinent considerations include whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Id.* (internal quotation marks and citations omitted).  Another important

---

[6]In his affidavit, Defendant Post avers that no Plaintiff ever told him that they actually supported DeVos for governor in the 2006 gubernatorial election, and he had no knowledge of which candidate, if any, Plaintiffs supported in that election.  (Post Aff. ¶ 18.)  There is no deposition testimony by Post to the contrary.

distinction is between speech that occurs in the office and that which does not. "Speech and conduct that occur outside the office walls and that do not relate to work interfere less with office efficiency than conduct that occurs inside the office or that relates to the employee's work." *Id.* at 257-58. Because Plaintiffs are independent contractors, the *Pickering* balancing test is "adjusted to weigh the government's interests as contractor rather than employer. . . ." *Umbehr*, 518 U.S. at 673.

Applying the *Pickering* balancing test, Plaintiff Dye's political speech would not impede the performance of his duties or interfere with the regular operation of the ORC. The same is not true of Plaintiff Hall's political speech, i.e., urging licensees regulated by the ORC to vote for a certain political candidate. Accordingly, Dye's speech is entitled to First Amendment protection whereas Hall's is not. As Defendant White testified, the concern with Plaintiff Hall's reported political speech was that it involved his urging licensees regulated by the ORC to vote for DeVos and thus had the potential to interfere with the ORC's efficacy and efficiency.

### b. October 2005 Political Speech Opposing Defendant White's Confirmation as Racing Commissioner

Plaintiffs also claim that Defendants retaliated against them because of their political speech opposing Defendant White's confirmation as the Racing Commissioner in October 2005. Defendants argue that there can be no retaliation because Plaintiffs did not engage in protected political speech in connection with White's 2005 confirmation. This Court agrees with Defendants.

Defendant White testified at her State Senate confirmation hearing in October 2005.

17

The Senate voted the next day on her confirmation.  (White Dep. at 28-39.)  White never made any inquiry as to who testified at her confirmation hearing because she was present for the entire hearing.  (White Dep. at 36-37.)  Contrary to Plaintiffs' factually-unsupported speculation, Defendant White denies that she ever asked anyone to find out who opposed her appointment as Racing Commissioner or who provided documents with regard to her confirmation hearing.  (White Dep. at 38-39.)  Everyone who testified at the hearing did so when Defendant White was in the room, including Ms. Gibson, the State-employed clocker from Great Lakes Downs, and others.  (White Dep. at 28, 32-34.)

Defendant Post testified that he does not know who testified at Defendant White's confirmation hearing and denies he ever made any inquiry as to who testified or what documents were provided in connection with White's confirmation hearing.  (Post Dep. at 47.)  It was not until almost one year after White's confirmation that Defendant Post was first hired as a contract management consultant by the Human Resources Director of Michigan's Agriculture Department.  He was then appointed, in October 2006, to the Deputy Racing Commission position.  (Post Dep. at 16-17, 29-33.)  Post was not working for the State or at the ORC during the time of White's confirmation.  Defendant Post also denies that Defendant White ever asked him to obtain information about who may or may not have testified at her confirmation hearing.  (Post Dep. at 41-44.)

Contrary to Plaintiffs' claims of retaliation for speech in connection with White's confirmation as Racing Commissioner, Plaintiffs Dye, Perttunen, and Hall each denied that they contacted or expressed their opposition to anyone associated with Defendant White's confirmation or provided any information in opposition to White's confirmation as Racing

18

Commissioner. (Dye Dep. at 45-52, 106-07; Perttunen Dep. at 23-28; Hall Dep. at 69-89.)

Specifically, Dye denies that he personally opposed Defendant White's confirmation. He also denies that he provided any information about White to any legislative aide or anyone involved with her State Senate confirmation. Rather, Dye testified that his only contact with aides to two State Senators was to learn the procedure for White's confirmation proceedings. (Dye Dep. at 45-50.) He denies that he wrote any letters opposing her as Racing Commissioner. (Dye Dep. at 106.) He denies he knew why Post had accused him of being the biggest instigator against White as Commissioner. (Dye Dep. at 107.) Dye admits that he did discuss White's confirmation with the other Plaintiffs and with others in the ORC office but clarified that it was just talk about her being a political appointee, her knowledge of racing, her credentials to be Racing Commissioner, and whether these other people thought she should be confirmed as the next Racing Commissioner. (Dye Dep. at 51-52.)

Perttunen also denies that he ever opposed Defendant White's confirmation as Racing Commissioner. He denies that he ever discussed her confirmation with or provided any information to anyone involved in White's confirmation. He denies that he ever criticized White as Racing Commissioner to the horsemen or others in the racing industry. He admits, however, that he did discuss both Defendants Post and White with the other Harness Stewards. These discussions involved work-related complaints and, in particular, instances when the Harness Stewards disagreed with Defendants Post's and White's work decisions. (Perttunen Dep. at 23-28.)

Plaintiff Hall also testified that, although he personally opposed White's confirmation

19

because he did not feel she was the right person for the job, he did not do anything to formally oppose her confirmation.   He did not talk to anyone associated with the confirmation process about her confirmation.  He denies that he ever expressed his opinion to any other members of the racing industry.  He only expressed his opposition to White's confirmation to the other four Harness Stewards.  (Hall Dep. at 69-71.)   After White's confirmation, Hall testified that he only discussed his opinion of Defendant White as Racing Commissioner with the other four Harness Stewards and with Defendant Gary Post. Examples of these discussions include the decision to license a 160-pound jockey, her handling of appeals, and that she took too many calls from horsemen.   (Hall Dep. at 71-89.)

Plaintiff Tammie Erskine is the only Plaintiff who testified that she had discussed her lack of support for Defendant White as Racing Commissioner with her State Senator, Mike Gotchka, both before and after White's confirmation.  (Erskine Dep. at 57-58, 63.)  Although Erskine spoke with Senator Gotchka, she denies that she provided any information to him or his aide about Defendant White with regard to her confirmation.  (Erskine Dep. at 48, 50.)  She also denies that she provided anything in writing to any of the State Senators involved in Defendant White's confirmation.  (Erskine Dep. at 49.)

Plaintiff Erskine explained how she came to discuss Defendant White with State Senator Gotchka.  In October 2005, an aide from State Senator Mike Gotchka's office contacted Plaintiff Erskine, told her that a State clocker from Great Lakes Downs, Suzanne Gibson, had contacted their office to complain about Defendant White's observation of her and decision to support the track clocker's time calculation as opposed to Ms. Gibson's

time calculation.  Erskine explained why she was likely contacted.

There are two clockers at the race tracks:  track management has a clocker and there is a State clocker.  Plaintiff Erskine testified that the track clocker did not like Ms. Gibson, the State clocker, and there were discrepancies in their times.  Defendant White came out to Great Lakes Downs to observe Ms. Gibson.  While there, there was a time discrepancy, and White demanded that Ms. Gibson give the race horse's time as recorded by the track clocker, and Ms. Gibson thought that this was ridiculous.[7]  Ms. Gibson, who is from out-of-state and does not have a state representative, asked Plaintiff Erskine how she could complain about Defendant White's decision.  Plaintiff Erskine suggested that Ms. Gibson call Erskine's State Senator, Senator Mike Gotchka.  Ms. Gibson apparently did that.  Erskine was contacted by State Senator Gotchka's office after Ms. Gibson spoke with them.  (Erskine Dep. at 35-44.)

When Erskine returned the call and spoke with State Senator Gotchka's aide, he told Erskine that other state senators and representatives had been contacted by horsemen and others in the racing industry about Defendant White performance as Acting Racing Commissioner and specifically mentioned State Senator Sikkema.  Erskine denied that she spoke to Senator Sikkema about Defendant White.  (Erskine Dep. at 44.)  Erskine refused to testify against Defendant White at White's confirmation hearing because she believed that she would probably be fired.  She did not provide facts supporting her belief; only speculation. (Erskine Dep. at 47-48, 73-74.)

---

[7]Plaintiff Erskine did not witness the race; she only heard about it from Ms. Gibson.

After Defendant White's confirmation in October 2005, Plaintiff Erskine also spoke with an aide from Senator Birkholz's office to follow up on allegations that Defendant White may have violated some policy by personally going to the home of each of the State Senators involved in her confirmation process before her confirmation hearing. Erskine testified that she did not talk to Senator Birkholz about her opposition to Defendant White's confirmation as Racing Commissioner. (Erskine Dep. at 62-63.) Erskine also testified that, after White's confirmation, she continued to discuss her opposition to White as Racing Commissioner with her peers, discussed her criticisms of Defendants White and Post as Racing Commissioner and Deputy Racing Commissioner with them, but did not discuss her opposition to Defendant White as Racing Commissioner with anyone in the industry other than Ms. Gibson. (Erskine Dep. at 57-58, 60-62, 64-71.)

Unlike discussions about the candidates in an upcoming general election, Plaintiff Erskine's speech regarding Defendant White's decision, as Acting Racing Commissioner, to support the race time provided by a track clocker as opposed to that provided by Ms. Gibson, the State clocker, was not speech on a matter of public concern and is not protected by the First Amendment. *See Scarbrough*, 470 F.3d at 256 (defining matters of public concern to "include speech that relates to any matter of political, social, or other concern to the community."). In *Connick*, the Supreme Court cautioned that "when a public employee speaks not as a citizen on matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Connick*, 461 U.S. at 147.  Accordingly, even if Defendants did implement employment decisions in reaction to Plaintiff Erskine's decision to involve herself in Ms. Gibson's employment dispute with Defendant White, the federal court is not the appropriate forum in which to review the wisdom of Defendants' personnel decisions.

Moreover, even if Plaintiff Erskine's speech with her State Senator regarding White's performance as Acting and then confirmed-Racing Commissioner is construed as speech on a matter of public concern, the *Pickering* balancing test must be applied.  "Government employees' First Amendment rights depend on the 'balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Umbehr*, 518 U.S. at 676 (quoting *Pickering*, 391 U.S. at 568).

Applying the *Pickering* balancing test, this Court finds that Plaintiff Erskine's speech related to work performed by the ORC and had the potential to interfere with that office's efficiency.  Accordingly, it is not entitled to First Amendment protection.  "Federal courts must exercise great caution before stepping into employment disputes, and must be convinced an actual constitutional right has been significantly impaired." *Barkoo v. Melby*, 901 F.2d 613, 617 (7th Cir. 1990).  "[T]he *Connick* test requires us to look at the *point* of the speech in question:  was it the employee's point to bring wrongdoing to light?  Or to raise issues of public concern, because they are of public concern?  Or was the point to further some purely private interest?"  *Id.* at 618 (internal quotation marks and citations omitted).  These are important questions to consider so as to avoid turning "every employment dispute involving a public agency" into "a matter of public concern."  *Id.*

23

> If every facet of internal operations within a government agency were of public concern, and therefore any employee complaint or comment on such matters constitutionally protected, no escape from judicial oversight of every governmental activity down to the smallest minutia would be possible.   In *Connick*, the Supreme Court distinguished a case in which it held employee speech to be protected, *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410 (1979), noting that employee speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest . . . .  [A]nalysis of whether discussion of office morale and discipline could be matters of public concern is beside the point – it does not answer whether *this* . . . is such speech."

*Id.* (quoting *Connick*, 461 U.S. at 149 n.8).  Applying the above analysis here, Erskine's speech to her State Senator stating her opinion whether Defendant White should be confirmed as the Racing Commission or telling her State Senator that she disagreed with White's decision to side with a track clocker as opposed to the State clocker, Ms. Gibson, are matters of personal concern; not public concern.  Accordingly, this Court finds that Plaintiff Erskine, like the other Plaintiffs, did not engage in protected speech in connection with White's 2005 confirmation as Racing Commissioner.

### c.  Conclusion Re: Plaintiffs' Protected Speech

As discussed above, only Defendant Dye engaged in political speech when he expressed his support for DeVos as candidate in the 2006 governor's election.  As shown below, however, no Plaintiff can establish the additional elements of their prima facie case of First Amendment retaliation.[8]

---

[8]For this reason, there is no need to address Defendants' additional argument that any evidence that they retaliated against Plaintiffs for perceived protected speech, in the absence of any actual protected speech, does not constitute a constitutional violation.

Defendants' argument, however, is persuasive in light of the following appellate

### 2.  Political Association or Affiliation With Republican Party

Plaintiffs also claim that Defendants retaliated against them because they affiliated or associated themselves with the Republican Party generally or a particular Republican gubernatorial candidate in the 2006 election.  For support, they rely on *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990).  In *Rutan*, four of the plaintiff public employees claimed that they were "denied promotions, transfers, or rehires for failure to affiliate with and support the Republican Party."  *Id.* at 76.  Another plaintiff claimed that "patronage hiring violates the First Amendment."  *Id.*  The Supreme Court held that adverse employment

---

decisions that have addressed this issue.  *See*, e.g., *Ambrose v. Tp. of Robinson, Pa.*, 303 F.3d 488, 495 (3d Cir. 2002) (observing that a "'perceived support' theory cannot form the basis of a First Amendment retaliation claim."); *Fogarty v. Boles*, 121 F.3d 886, 890 (3d Cir. 1997) (rejecting a plaintiff public school teacher's First Amendment retaliation claim where the plaintiff denied he engaged in the protected speech of which the defendant principal wrongfully accused him of engaging in; and, quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), observed that "the Supreme Court made it clear that 'the burden was properly placed upon [plaintiff] to show that his conduct was constitutionally protected, and that his conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him,'" and "[i]t was obvious that [the plaintiff public school teacher] . . . cannot sustain that burden of proof because there is no conduct that was constitutionally protected – indeed, there was no conduct – period."); *Wasson v. Sonoma Cnty. Jr. College*, 203 F.3d 659, 662 (9th Cir. 2000) (rejecting the plaintiff's argument "that the defendants retaliated against her for speech that she insists she did not make" and observing that "[a] First Amendment claim is not a wrongful termination claim.  Rather, a First Amendment retaliation claim seeks to vindicate a public employee's exercise of free speech rights when she has suffered an adverse employment action in response to having spoken out publicly."); *Jones v. Collins*, 132 F.3d 1048, 1054 (5th Cir. 1998) (same); *Barkoo v. Melby*, 901 F.2d 613, 617, 619 (7th Cir. 1990) (observing that "[f]ederal courts must exercise great caution before stepping into employment disputes, and must be convinced an actual constitutional right has been significantly impaired," and holding that "[t]o the extent [the plaintiff] alleges that her employers retaliated against her because they *thought* she was engaged in First Amendment protected speech on an issue of public concern, we reject the notion that this allegation brings her claim within the requirements of § 1983.  Every § 1983 case relating to workplace freedom of speech, from *Connick*, on down, discusses the actual speech engaged in by the employee.").

decisions "based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Id.* at 75. The Court also held that "conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so" and found "no such government interest" under the facts of *Rutan*. *Id.* at 78.

To the extent Plaintiffs' association/affiliation claim arises from their political speech concerning the 2006 gubernatorial election, those claims are addressed above. Apart from that speech, to the extent Plaintiffs' claim arises from their alleged association or affiliation with the Republican Party, there is no deposition testimony or other evidence that any of the Plaintiffs ever told either Defendant White or Defendant Post that they associated themselves with or were affiliated with the Republican Party. Likewise, there is no evidence that any of the Plaintiffs exhibited in any way an affiliation or association  with the Republican Party. Specifically, as to Plaintiff Dye – the one Plaintiff who engaged in protected speech – there is no evidence that he ever told Plaintiffs or anyone else that he was affiliated with the Republican Party or that he exhibited any objective manifestation of any affiliation or association with any political party. (Dye Dep. 35-36, 41-42, 53-54.) Plaintiffs' speculation to the contrary is rejected. Likewise, the hearsay, opinion testimony,[9] and factually unsupported conclusions[10] contained in Plaintiffs' affidavits from former ORC employees is insufficient to support Plaintiffs' claims of retaliation based on their affiliation

---

[9]*See, e.g.*, Brown Aff. ¶ 13; Jewell Aff. ¶ 4; Bowes Aff. ¶ 8; Rutkowski Aff. ¶ 9.

[10]*See, e.g.,* Brown Aff. ¶¶ 2-4; Rutkowski Aff. ¶ 6.

or association with the Republican Party or a 2006 Republican Party candidate.[11]

The Court now considers the second and third elements of Plaintiffs' § 1983 First Amendment retaliation claim.

### 3. Alleged Adverse Action and Required Causal Link

"An adverse action is an action 'that would deter a person or ordinary firmness from the exercise of the right at stake.'" *Mills*, 476 F. Supp. 2d at 661 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (*en banc*). In the context of a First Amendment retaliation claim, the court examines "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Thaddeus X*, 175 F.3d at 397 (internal quotation marks and citations omitted). "Although several courts have cited dicta in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 n.8 (1990), for the proposition

---

[11]Federal Rule of Civil Procedure 56(c)(4) provides that:

An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, <u>set out facts that would be admissible in evidence</u>, and show that the affiant or declarant is competent to testify on the matters stated.

Affidavits that state Defendant White created a hostile work environment yet fail to set out facts showing that the hostility was because of political speech or association do nothing to advance Plaintiffs' First Amendment retaliation claims. *See, e.g.,* Brown Aff. ¶¶ 5-7; Jewell Aff. ¶¶ 2-3, 5; VanDevelde Aff. ¶¶ 2-7; Bowes Aff. ¶¶ 6-7; Hay Aff. ¶¶ 2-7; Rutkowski Aff. ¶¶ 1-5, 11-13, 16-17.

Moreover, although Brian Brown avers that he had a conversation with Defendant Post about Plaintiffs' lawsuit in 2007, this lawsuit was not filed until August 3, 2009. (Brown Aff. ¶¶ 9-13.) Likewise, although Celine Rutkowski avers (¶¶ 14-15) that she was outside Defendant White's office when she learned about this lawsuit and was able to her Defendants White and Post make comments about "getting the Plaintiff group," this lawsuit was filed <u>after</u> Defendant White and Ms. Rutkowski were no longer employed at the ORC.

that 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights' is sufficient to find an adverse action, the Sixth Circuit has explicitly rejected this dicta." *Mills*, 476 F. Supp. 2d at 661 n.8 (quoting *Thaddeus X*, 175 F.3d at 397-98). Moreover, "[p]urely personal reasons for preferring a former state of affairs over the current state of affairs are insufficient to make a change an adverse action." *Id.* at 661-62 (citations omitted). Likewise, "[c]riticisms, accusations, threats, or bad mouthing are not enough." *Id.* at 662 (internal quotation marks and citations omitted).

Beyond allegations of bad mouthing, accusations, criticisms, or a Plaintiff's personal preference for the way things ran before Defendants White and Post became the Racing Commissioner and Deputy Racing Commissioner, respectively, the alleged adverse actions taken against Plaintiffs can be discussed in the following categories: (1) the Fall 2006 decision to eliminate the position of Administrative Liaison Steward; (2) the decrease in assigned work days (and thus pay) for Plaintiffs; (3) the adoption of stricter timekeeping procedures, including (a) the scheduling and authorization of full days versus half days, and (b) the elimination of the practice of "banking time" in a pay period outside the period the work was performed; (4) the elimination of travel expense reimbursements in connection with the Harness Stewards' bi-annual certification conference in November 2006 and 2008; and (5) the elimination of two Harness Stewards – Plaintiffs Dye and Erskine – in June 2009. The Court addresses each of these in turn, beginning with the elimination of the Administrative Liaison Steward position.

**a.  Fall 2006 Decision to Eliminate Administrative Liaison Steward Position**

28

In 2006, when Defendant Gary Post was appointed Deputy Racing Commissioner, the ORC also employed an Administrative Steward (also referred to as "Administrative Liaison Steward") by contract.  (Post Aff. ¶ 6.)  The Administrative Steward generally worked out of the central office in Lansing, Michigan, and coordinated the appeals process, scheduled the Stewards, assisted with the development of policy, worked at the various tracks to assist in preparing the respective track for the race season, filled in when needed as a race Steward, and assisted the Stewards with regulatory matters.  (Post Aff. ¶ 7.)

Plaintiff Jeff Dye served as the Administrative Steward until December 31, 2006 when the position was eliminated.  (Post Aff. ¶ 8.)  When he first started in that position in 1998, Plaintiff Dye earned about $244,000 or $268,000 and had a couple of salary increases before the position was eliminated on December 31, 2006.[12]  Dye also received other perks – like a state-assigned car, a gas card, a personal cell phone, and expenses paid for overnight stays and a lunch per diem if he worked out in the field.  (Dye Dep. at 22-23.) The other Harness Stewards earned far less annually; typically somewhere from the $50,000 range to the $80,000 range per year, depending on how many days they worked. (Erskine Dep. at 33-35; Hall Dep. at 5-8; Perttunen Dep. at 32-33.)

Because of budget concerns, Defendants White and Post were required to examine how the ORC staff was being used.   Racing Commissioner White determined, and Defendant Gary Post agreed, that the amount and type of work performed by the Administrative Steward no longer justified the continued cost of that full-time position in the

---

[12]While in the Administrative Steward position, Dye also filled in for Stewards and got the same per diem pay that Stewards received.  (Dye Dep. at 56-59, 72.)

29

Lansing office. (Post Aff. ¶ 8.)  Many of the tasks at an administrative level – such as policy writing, scheduling, and budget development – required excellent writing skills and proficiency with electronic spreadsheets.  Based on Post's and Racing Commissioner White's assessment, Plaintiff Dye did not have the necessary computer or writing skills to perform the tasks required for the position of Administrative Steward, and they could not justify the continued expense of keeping him in that position.  (Post Aff. ¶ 8; Erskine Dep. at 106-07, admitting that Dye lacked computer skills.)  The Administrative Steward position was terminated for budgetary reasons and because Defendant Post, the Deputy Racing Commissioner, believed that he could perform the responsibilities of that position.  (White Dep. at 87.)  Although he disputes the wisdom of the decision, Dye admits that the letter informing him of the elimination of the Administrative Steward position attributed it to budgetary concerns.  (Dye Dep. at 70-71.)

Defendant Post met with Plaintiff Dye sometime between October 11, 2006 and November 8, 2006 to discuss the elimination of the Administrative Steward position and returning Dye to the regular Harness Steward rotation.  Plaintiff Dye's duties in the Lansing office ended November 8, 2006.  He was assigned to work at the Sports Creek Raceway to prepare it for the racing season and to handle daily duties at the track.  Plaintiff Dye continued his administrative duties through the end of his contract on December 31, 2006. Plaintiff Dye continued to provide input into the Stewards' work schedule until his Steward contract was terminated in June 2009.  (Post Aff. ¶ 8.)

In a December 15, 2006 email, Defendant Post advised the ORC staff members that Plaintiff Dye would be leaving his role as the Administrative Liaison Steward and moving

back to the regular Stewards' schedule rotation as of January 1, 2007. (Defs.' Mot., Ex. 9, 12/15/06 Post email.) Besides complimenting and thanking Dye for serving in that capacity, Defendant Post provided the administrative and budgetary reasons for the change:

> First, the shift in positions is part of a larger restructuring of the organization that is occurring as Chris [White] and I realign ORC resources to better carry out the mission. A number of you have commented to me on your perception that ORC is "heavy" on the central office administration side. Moving Jeff's knowledge and experience back out into a steward's role in the field, as well as the continuing vacancy in the Administrative Deputy position, help to address that issue. Additionally, as I have settled into my new role and streamlined some of the administrative processes, I have found that the deputy's role no longer requires the level of administrative support that the Administrative Liaison Steward position provided in the past. On the occasions when I have needed technical or historical advice and support, many of you have been very gracious about sharing your particular expertise with me. A related benefit of "flattening" the organization by eliminating a layer of administration is that it puts me in direct contact with our stewards, veterinarians and other staff members to facilitate your efforts and better understand your concerns.

> A second reason for this organizational change has to do with being good managers of our resources at a time when Michigan in general, the horse racing industry, and all of state government, are going through difficult economic times. Many of you have been personally impacted by the budgetary reductions of the past year. In light of the anticipated level of state tax revenues, all state departments have been told to anticipate another 5% budget reduction in this fiscal year and – depending again on revenues – a similar budget reduction in 2008. For the ORC, the cost savings generated by shifting a position from central office administration back to the field will better position us to meet those reductions and still carry out ORC's core mission.

(*Id.* at 2.)

Despite Plaintiff Dye's claim that Defendants eliminated the Administrative Steward position to retaliate against him for his political speech, Dye testified that his responsibilities as Administrative Steward were being diminished as early as June and July of 2006; months before the alleged political speech. (Dye Dep. at 44-45.) Dye also admits that he

31

was advised in November 2006 that the Administrative Steward position was being eliminated because of budgetary concerns. (Dye Dep. at 29.) He concedes that he is not aware of anyone being subsequently hired for that Administrative Liaison Steward position. (Dye Dep. at 32.)

Beyond the closeness in time between the decision to eliminate the Administrative Liaison Steward position and Dye's general discussions with Defendants about who was the better candidate in the 2006 gubernatorial election, Plaintiffs present no evidence establishing the required causal link between that political speech and this adverse employment action. Even if this were sufficient to establish the causation element of Plaintiffs' prima facie case, Defendants have come forward with evidence showing that the position would have been eliminated for budget reasons even absent Dye's protected speech. The Court finds that "no reasonable juror could fail to return a verdict" for Defendants. *Eckerman*, ___ F.3d at ___, 2010 WL 5140625 at *4. Accordingly, summary judgment on this claim is warranted.

### b. Decrease in Assigned Work Days for Plaintiffs

Plaintiffs complain that their work days and thus their ability to earn income was decreased in retaliation for their protected First Amendment activity. Specifically, Plaintiffs complain that Defendants (1) refused to give Plaintiffs first choice to fill open Steward dates; (2) hired out-State residents, Daryl Parker and Ward "Dick" Garrison as Thoroughbred Stewards rather than giving the work to Plaintiffs; (3) hired another Ohio resident, Robert Coberley, in 2008 as a Harness Steward rather than giving the work to Plaintiffs; and (4) decreased the number of race days at various race tracks. Defendants

32

provide legitimate, non-retaliatory reasons for their actions and further argue that Plaintiffs cannot establish the required causal link between the challenged policies and their alleged First Amendment activity.  This Court agrees with Defendants.

### (1)   No Written Seniority/Priority Promise

Plaintiffs complain that Defendants retaliated against them when they decided not to adopt the seniority/preference practice used by prior Racing Commissioners.   This argument fails for the following reasons.

Plaintiffs were never guaranteed any specific number of work hours, work days, or income over the term of their contracts.  There was nothing in their contract and no written policy that required that work assignments be made on the basis of seniority or preference. Plaintiffs concede this fact.  (Dye Dep. at 82-84; Erskine Dep. at 165-70; Hall Dep. at 6; Perttunen Dep. at 12-13.)  There was nothing that required the ORC to give Plaintiffs first choice to work open dates for Harness races or to work open dates when Thoroughbred or Quarter Horse race Stewards were unavailable.  Civil Service Commission Rule 7 did not make any guarantees or apply any principles of seniority or preference to Plaintiffs. (Defs.' Ex. 14, CRC R7.)  In the years during and after Plaintiffs had written contracts, Defendants made no promises to Plaintiffs that they would work a specific number of race days, work specific types of races, or earn a specific income.  (Perttunen Dep. at 12-16.)

Plaintiffs' complaint here is that Defendants never adopted the unwritten seniority or preference policy they claim previous Racing Commissioners and Deputy Racing Commissioners followed.   Other than speculation, Plaintiffs present no evidence that Defendants' decision not to adopt this unwritten seniority or preference policy was because

33

Plaintiffs had engaged in protected political speech during Defendant White's confirmation in 2005 or the general election for governor in November 2006.

**(2)     Hiring and Use of Stewards Other Than Plaintiffs**

Plaintiffs also contend that Defendants' hiring and scheduling decisions were motivated by Defendants' desire to retaliate against them for engaging in protected First Amendment activity.  This argument also fails.

During the time period relevant to this lawsuit, the ORC employed three Thoroughbred Stewards by contract; three Quarter Horse Stewards by contract; and six Harness Stewards by contract.  (Post Aff. ¶ 6.)  Beginning in 2008, individual contracts for the Harness Stewards were not offered or entered into.  (Perttunen Dep. at 9; Dye Dep. at 67-68.)

In 2006, the Thoroughbred Stewards included Daryl Parker, Heriberto Rivera and Adam Campola.  Mr. Parker had been a full-time contract Thoroughbred Steward with the ORC before Post was hired in 2006, and he was from Ohio.  In 2007, Adam Campola did not return as a Thoroughbred Steward, because he had taken a job out of State.  The ORC then contracted with Ward "Dick" Garrison to fill the third Thoroughbred Steward spot.  Mr. Garrison was from Ohio.  When Heriberto Rivera left in 2008, Billy Williams was hired as a contract Thoroughbred Steward.  (Post Aff. ¶ 9.)  Billy Williams was from somewhere in the South.  (White Dep. at 81.)

In 2006, the three Quarter Horse Stewards were Maurice "Bud" Martin, Don Johnson, and Don Price.  With the exception of Don Price, who filled in occasionally at the harness races), these Stewards were used only for Quarter Horse racing.  (Post Aff. ¶ 10.)

34

In 2006, the six Harness Stewards included Plaintiffs Jeff Dye, Tammy Erskine, Patrick Hall, Erik Perttunen, and non-plaintiffs Peter O'Hare, and Don Price.

In late 2007, the sixth Harness Steward, Don Price, who only worked part-time at the harness races to fill in as needed, was no longer able to work for medical reasons. The ORC contracted with Robert Coberley to be the sixth Harness Steward. He was not hired as the Administrative Steward – the position that had been eliminated on December 31, 2006. Coberley began working as the part-time, fill-in Harness Steward on January 22, 2008. Mr. Coberley generally worked when two harness tracks were running simultaneously and six Harness Stewards were required. (Post Aff. at ¶ 11.)

At times in 2008, both Sports Creek Raceway and Northville Downs would run at the same time, typically on Saturdays, but sometimes on other days as well. This required a sixth Harness Steward to assure full coverage at each track. (Post Aff. at ¶ 11.) Mr. Coberley was used as the sixth Steward. Mr. Coberley would also fill in at a harness track when a scheduled Harness Steward was unable to work because of illness or when a double-header was running – 12 races in the afternoon and 12 races at night. Mr. Coberley was scheduled to work one of the race cards, and the other Harness Stewards would rotate the double assignment. Defendant Post decided to use Coberley in this manner to assure that he received sufficient work days in order to retain him. Without sufficient work days and corresponding pay, Coberley would have terminated his services. If Coberley left, this would have created a scheduling problem because the ORC would not have enough Stewards to cover double-headers or simultaneous race meets. (Post Aff. ¶ 11.) Although Plaintiff Dye was responsible for scheduling Stewards at this time, Post would tell him when

and where to insert Mr. Coberley in the work rotation.  (Post Aff. ¶ 11.)

Because Mr. Coberley was also adept at writing policy and had computer skills, he was also occasionally used to draft policy.  He also developed an automated scheduling process for the Stewards that could project staffing needs for budget-planning purposes. Before use of this automated program, scheduling was done by hand on paper.  (Post Aff. ¶ 11.)

The Quarter Horse and Thoroughbred Stewards did not generally cross-over to cover Harness races.  A Harness Steward, however, would be used to fill-in, as needed, for a Quarter Horse or Thoroughbred Steward.  In 2006, 2007, and 2008, Plaintiffs Dye, and occasionally Plaintiff Erskine, both Harness Stewards would be used to fill-in for the Quarter Horse or Thoroughbred Steward who was unable to work.  (Post Aff. ¶ 12.)

In 2008, Pinnacle Race Course opened in Romulus.  Because of the possible need for an additional fill-in Thoroughbred Steward, Post asked and Plaintiff Perttunen agreed to work at Pinnacle and to cross-train as a Thoroughbred Steward.  (Post Aff. ¶ 12.)  To make an opening for Plaintiff Perttunen, Post re-assigned Billy Williams – who was the third Thoroughbred Steward at Pinnacle at the time – to the Mt. Pleasant Meadows Track. Williams handled the administrative work and worked the races on Saturdays and Sundays. (Post Aff. ¶ 12.)

Defendants have provided ample evidence that their hiring and scheduling decisions would have been the same absent Plaintiffs' protected conduct.  Plaintiffs, on the other hand, have not presented evidence establishing the requisite causal link between these employment decisions and any protected First Amendment activity.  Other than Plaintiffs'

36

complaint that Defendants should have adopted the unwritten seniority policy used by other Racing Commissioners and speculation, there is no evidence that Defendants' employment decisions were motivated in any way by Plaintiffs' protected conduct.

### (3)   Reduction of Racing Days

Plaintiffs also complain that the number of racing days provided to them were reduced by Defendants to retaliate against them for their protected First Amendment activity. Plaintiffs' arguments fail because (1) Defendants provide amply evidence showing that budgetary concerns caused the reduction in racing days and these would have occurred absent any protected First Amendment conduct; and (2) Plaintiffs ignore that the reduced racing days affected all Stewards and other ORC employees; not just Plaintiffs and thus cannot be causally linked to their alleged protected First Amendment conduct.

Budget cuts to the Racing Commission's budget, effective October 1, 2007 and October 1, 2008, resulted in a reduction of the number of racing days for Thoroughbred, Quarter Horse and Harness racing dates in 2008 and an additional 18% reduction in 2009. (Post Aff. ¶ 14.)  The racing dates by year as shown in Exhibit A to Defendant Post's affidavit confirm this fact.  (Post Aff., Ex. A.)  Exhibit A also provides a more detailed comparison of actual race dates by track for 2009 after additional budget cuts were made effective May 5, 2009, and the race dates that were applied for in 2010.  (*Id.*)  Between 2005 and 2009, racing days were reduced from 548 to 276.  (*Id.*)  Plaintiffs concede that budget cuts caused a decrease in the number of race days during this time period.  (Dye Dep. at 93; Hall Dep. at 15, 124, 154-55.)

The reduction in race dates affected the number of races and the number of race

Stewards, Veterinarians, Licensing Clerks, and Laborers needed for the remainder of 2009 and 2010.  (Post Aff. ¶ 14.)  Less were required.  (Post Aff. ¶ 16.)

The number of race dates that were restored for 2009 and that were subsequently scheduled for 2010 for harness racing required only three Harness Stewards.  Adjustments for the Quarter Horse racing were also required.  Steward Billy Williams' administrative work days were cut from five to two days a week at the Mt. Pleasant track, and he was returned to the Pinnacle track on race days.  (Post Aff. ¶ 16.)  The work days for the Thoroughbred Stewards at Pinnacle were also reduced due to fewer races, and they were rotated to Mt. Pleasant to work on race days there.  Work day assignments were made as equal as possible among the Quarter Horse and Thoroughbred Stewards in order to retain them.  Further loss of pay would have resulted in losing some of these Stewards, which would then cause scheduling and race coverage problems.  (Post Aff. ¶ 16.)

Plaintiffs present no evidence challenging this evidence.  Moreover, Plaintiffs concede that the challenged decisions affected all Harness Stewards – not just Plaintiffs.  (Erskine Dep. at 132-35, 141, 150, 613-65; Hall Dep. at 15.)  Because they cannot show that they were treated less favorably than other similarly situated Harness Stewards, Plaintiffs cannot establish the necessary causal link required for their First Amendment retaliation claim.

### c.  Adoption of Stricter Timekeeping Procedures

#### (1)   Scheduling and Authorization for Full-Days Versus Half-Days

Plaintiffs complain that Defendants retaliated against them for their political speech when they adopted a policy for Harness Stewards that required them to obtain authorization from Defendant Post before working a full-day instead of the scheduled morning-only, half-

day session.  Defendants present evidence showing that this practice was adopted as part of an effort to achieve more accountability and predictability for scheduling purposes and for agency audit purposes.

As stated above, Defendant Post testified that, while employed as a management consultant for the Michigan Department of Agriculture, he discovered and reported that the ORC lacked accountability for timekeeping.  (Post Dep. at 45.)  On June 1, 2007, Defendant Post, now in the role of Deputy Racing Commissioner, issued a memo to all Stewards, not just Harness Stewards, addressing timekeeping issues. (Defs.' Mot., Ex. 11, Post 6/01/07 memo.)  In an effort to address both the Stewards' concerns about being paid for a half day when they worked an extra two or three hours beyond the morning and the State's very limited budgetary resources, Defendants Post and White implemented new timekeeping practices.  (*Id.* at 1.)  As Defendant Post explained, "[t]he Commissioner and I want to compensate you fairly, while at the same time maintaining a necessary level of accountability for the state's very limited budgetary resources."  (*Id.* at 1.)  The new timekeeping practices included:  (1) allowing Stewards to enter any additional time worked in 1/10 day increments; (2) requiring Stewards to enter their "begin time" and "end time" to improve accountability and to better prepare for agency audits; and (3) requiring Stewards to enter a brief description of their activity in the daily narrative.  (*Id.* at 1-2.)

In a December 5, 2008 email to all Harness Stewards, including Plaintiffs, Defendant Post addressed scheduling issues that had arisen in light of the reduced number of race dates due to the closure of Jackson Harness Raceway and the lack of "overlap" in the 2009 harness racing schedule.  (Defs.' Mot., Ex. 8, 12/05/08 Post email.)  Post explained that the

39

basic principle that guided staffing decisions was operational need – "how many ORC staff members do we need in the various disciplines (stewards, investigators, vets, etc) at any given moment [is] based on the operational requirements for those roles at the race track. . . . The point is that managing our resources appropriately requires that we <u>staff to the operational need that exists – no more and no less</u>." (*Id.* at 1 (emphasis in original).) Post also informed the Harness Stewards that he would approve full days for morning shifts only as the workload dictates:

> As stewards, you are paid on a "per diem" basis. That means literally "per day" or "by the day". That per diem status implies that there are (at least appropriately) <u>eight hours</u> worked for each "per diem" day claimed on a timesheet. I recognize that some days can be a little more than eight hours and some a little less, depending on the number of races and other demands on your time. I also recognize that some morning shifts are busier than others with draws, qualifiers, etc. The point is that there are some "morning shifts" where the work requires that you stay later in the afternoon in order to complete it. When that is the case, we are happy to compensate you for a full day. Often, however, that is <u>not</u> the case, and you are only required to be there until lunchtime, or shortly thereafter. In those cases, I would expect a steward to carry his or her time as <u>half a day</u>. The most recent schedule makes all the morning assignments <u>full days</u>. We just can't do that and remain within our budget projections. For that reason, <u>all morning shifts will be considered half-day shifts unless you receive my approval to carry a full day</u>. The way it will work is that if your work requires you to remain at the track well past the lunch hour, you can call me and tell me what you're working on (qualifiers, a late draw, etc.) and I will authorize the extra time. Please note that I am not accusing anyone of being unethical or putting in for time that they did not work. I know that you work hard and that you act with integrity with regard to your time keeping. This is about a proper degree of accountability and keeping the records straight. . . .

(*Id.* at 2 (emphasis in original).)

Plaintiffs' retaliation argument here also fails. First, although Plaintiffs may disapprove of and dislike the stricter timekeeping procedures Defendants adopted, this Court is not

convinced that they "would deter a person of ordinary firmness from the exercise of the right at stake," *Thaddeus-X*, 175 F.3d at 396, and thus do not constitute an adverse action as is necessary for Plaintiffs' First Amendment retaliation claim. Second, because these policies similarly affected all Harness Stewards and not just Plaintiffs, Plaintiffs cannot establish the required causal link necessary for their prima facie case of retaliation. (Perttunen Dep. at 90-91, 94-95; Dye Dep. at 89-91; Hall Dep. at 136-37.) Finally, even if Plaintiffs had established their prima facie case of retaliation, summary judgment for Defendants is warranted. Defendants have come forward with evidence showing that they would have reached the same timekeeping decisions absent any protected First Amendment activity. Viewing the evidence in the light most favorable to Plaintiffs, this Court finds that no reasonable juror could fail to return a verdict for Defendants.

### (2)   Elimination of Practice of "Banking Time" in Pay Period Outside Period Work Actually Performed

Plaintiffs complain that Defendants retaliated against them for their political speech when they eliminated the practice of "banking time" in a pay period outside of the period their work was actually performed. Plaintiffs testified that, although Defendant White called the practice "illegal" at the January 4, 2007 meeting with the Harness Stewards at the Sports Creek Raceway, Defendant Post or Defendant White told them that one of the reasons the "banked" time system was being discontinued was because Plaintiffs supported DeVos in the 2006 governor's election, opposed Defendant White's confirmation as Racing Commissioner, and showed a lack of support for White as Commissioner. Plaintiffs also testified that Defendants White or Post told them that the "bank" system

41

would be reinstated if Plaintiffs conformed to Defendant White's ways. (Hall Dep. at 61-62, 64-65, 68-70, 90-98; 122-23, Erskine Dep. at 109-111, 127, 129; Perttunen Dep. at 55-56 [Post "said we were trying to undermine the Commissioner by telling people to vote for DeVos, and in doing so, by getting DeVos in there, it would get rid of Governor Granholm who, in return, would get rid of [White]"], 57-58, 65-75, 78, 104-05; Dye Dep. at 65-67, 69-70, 106 [Post accused all in attendance "of trying to get Christine White replaced. You guys tried to de funk [sic] her in her confirmation hearing"], 107-09.)

Defendant Post denies that he had knowledge of which candidate Plaintiffs supported in the 2006 gubernatorial election and attests that none of the management decisions he made or implemented were based on Plaintiffs' political choices or positions. (Post Aff. ¶ 18.) Defendant White denies that she told the Plaintiffs that their banked time would be reinstated if she felt they deserved it and denies that she accused Plaintiffs of showing favoritism towards political candidates or telling them that that would affect their jobs. (White Dep. at 88-89.) White admits that, at the January 4, 2007 meeting with the Harness Stewards, she explained to them that "[a]s stewards they were delegated [to] the Commissioner's authorities and so therefore when we set policies we expected that they would support those." (White Dep. at 88.) When asked if she brought up Plaintiffs' perceived political leanings at that meeting, White replied that "[t]he only thing that I brought up was I said I had heard about Pat Hall making the comments while on duty to people that we regulated and that that was not allowed. They could campaign all they want or support anyone they wanted outside of duty time." (White Dep. at 88-89.)

Careful examination of the evidence describing this practice reveals that its elimination

42

does not constitute an adverse employment action.  Just as before its elimination, Plaintiffs continued to be paid for each day worked.  The only difference was that, after its adoption, the Harness Stewards could no longer delay payment beyond the pay period in which they performed the work for which they were being paid.  First an explanation of the policy.

Prior to Defendant White's appointment as Racing Commissioner, the Harness Stewards used a "bank" time system that was not authorized by their contracts, any written ORC policy, or Civil Service rule.  Only the Harness Stewards used this "bank" system. Like all the other racing Stewards, the Harness Stewards were paid on a per diem basis for each day worked.  The Harness Stewards, apparently with the unwritten approval of earlier Racing Commissioners, implemented the "bank" system to provide a more even pay distribution over the course of the year.  Harness Stewards were paid on the same schedule as other state employees – every second Thursday.  Typically, for state employees each two-week pay period included ten work days.  Contracted Harness Stewards, however, might be scheduled to work more than ten days in a two week pay period.  If they chose to do so, prior Racing Commissioners allowed them to submit their work time for only ten days and "bank" the remaining days.  For example, if a Harness Steward worked 11 days in a single two-week pay period, the Steward could submit 10 days for pay on their time sheet and put one day in the "bank."  The Steward would then use the "banked" time to fill in a future pay period when they might have worked less than the typical 10 days.  For example, a Harness Steward might work five days and take a week off but submit a time sheet that shows 10 days for payment.  The Steward would then deduct five days for his or her personal "bank."  (Post Aff. ¶ 13.)

43

Defendants Post and White were concerned about the appropriateness, accountability, and lack of management oversight of the "banking" process. After discussing it with the State Department of Agriculture's Human Resources Director, the decision was made to discontinue this practice because: there was no written policy authorizing or governing the practice; there was no authorization under the Civil Service rules applicable to personal services contracts or personal service employees like the Harness Stewards; it was not being used by the other racing Stewards; there was no management oversight, validation, or check on the time that was reported for payment and the time that was "banked;" and the Stewards managed their respective "bank" without any oversight or control by a time keeper or management. (Post Aff. ¶ 13.)

On January 4, 2007, Racing Commissioner White informed the Harness Stewards that the "bank" time system was being discontinued. The Harness Stewards were allowed to use their accumulated "bank" time until it was depleted, but were not allowed to accumulate any more time after January 4, 2007. (Post Aff. ¶ 13.)

Defendant White testified at her deposition that when she became aware of the "banked" timekeeping practice, she consulted with Robert Kaczorski, the Human Resources Director for Michigan's Department of Agriculture. He told her that the practice of "banking" days was a liability for the Agency. He told White that, because the Stewards were contract employees and not entitled to sick leave or annual leave, they should not be getting "banked" days to use for that purpose. (White Dep. at 48-49.) Defendant White relied on the advice of the Human Resources Director when she decided to stop the practice of "banked" time and told the Harness Stewards to use their "banked" days and

44

2:09-cv-13048-NGE-MAR   Doc # 54   Filed 05/31/11   Pg 45 of 52   Pg ID 1295

not to accumulate any more.  She did not consider her decision to be discretionary.  (White Dep. at 48-53.)

Contrary to Plaintiffs' claim that the elimination of this policy was to retaliate against them for their political speech, they concede that this decision applied to all the Harness Stewards; not just Plaintiffs.  (Erskine Dep. at 111; Dye Dep. at 106; Hall Dep. at 62-63, 91-92; Perttunen Dep. at 65.)  In January 2007, the Harness Stewards included Plaintiffs as well as non-plaintiffs Donald Price and Peter O'Hare.  (Post Aff. ¶ 13.)  This fact precludes Plaintiffs from being able to establish the required causal link necessary for their prima facie case of First Amendment retaliation.

Moreover, because Plaintiffs were allowed to use all their "banked" time and were paid for all days worked after the "bank" system was eliminated, they cannot establish that this employment decision constitutes an adverse action.  (Erskine Dep. at 122-27; Perttunen Dep. at 69-71, 77; Dye Dep. at 56-58, 65-67.)  The only difference under the new timekeeping system was that Plaintiffs were required to submit their time and be paid for each day they worked within the two-week pay period that their work was performed.  They could no longer delay payment.  They were not, however, denied payment. The Court does not find this change in timekeeping and payment date  sufficient to deter a person of ordinary firmness from continuing to engage in the type of First Amendment activity Plaintiffs describe.  (*See, e.g.,* Perttunen Dep. at 102-04, 113-15.)

Finally, Defendants have submitted evidence showing that they would have made the same employment decision absent the alleged First Amendment conduct.  Summary judgment is warranted on this claim because, even when viewed in the light most favorable

45

to Plaintiffs, "no reasonable juror could fail to return a verdict" for Defendants. *Eckerman*,
___ F.3d at ___, 2010 WL 5140625 at *4.

### d.  Elimination of Travel Expense Reimbursement

Plaintiffs claim they were retaliated against when Defendants decided they would not
be reimbursed for the mileage, hotel, and meal expenses in connection with the Harness
Stewards' biannual certification conference held in November 2006 and 2008.  Harness
Stewards, including Plaintiffs, were paid their daily per diem rate ($300/day) while attending
the conference, and the ORC paid their conference registration fees.  (Dye Dep. at 24-28;
Hall Dep. at 163-66; Perttunen Dep. at 79-81; Erskine Dep. at 115-118, 121.)

Plaintiffs do not dispute that this practice of non-reimbursement applied to all Harness
Stewards – not just Plaintiffs.  Likewise, Plaintiffs do not dispute that this practice continued
after Defendants left their employment with the ORC.  (Perttunen Dep. at 79-81.)  Because
this challenged employment action applied to all Harness Stewards and not just Plaintiffs
and because the practice continued after Defendants left the ORC, Plaintiffs cannot
establish the required causal link between any protected First Amendment activity on their
part and Defendants' decision to apply this non-reimbursement practice in 2006 and 2008.

### e.  Elimination of Two Harness Stewards - Plaintiffs Dye and Erskine

Finally, Plaintiffs Dye and Erskine claim that they lost their jobs as Harness Stewards
in June 2009 as a result of their protected First Amendment activity in 2005 and 2006.
There is no dispute that termination constitutes an adverse employment action.
Defendants do dispute, however, that Plaintiffs can establish the required causal link
between their termination and any protected First Amendment activity that occurred

46

approximately four and five years earlier. Defendants also provide the following non-retaliatory reasons for the decision to terminate Plaintiffs Dye and Erskine as Harness Stewards.

In addition to the earlier budget cuts described above, in May 2009, the Racing Commission received a further budget cut of $1.4 million – 70% of its remaining budget for the fiscal year ending September 30, 2009. (Post Aff. ¶ 15.) As a result, on June 2, 2009, Commissioner White issued a Non-disciplinary Order Cancelling Race Dates. (Post Aff., Ex. B, 6/2/09 Order.) Commissioner White cancelled some race dates for all tracks and for all racing. In addition, as stated in the Order, Commissioner White reduced the permanent Commission staff, resulting in 12 layoffs. She also reassigned other permanent staff, reduced contracted staff at the race track (laborers, clerks, veterinarians, etc.), eliminated two Harness Racing Stewards – Plaintiffs Dye and Erskine –, eliminated a Veterinary Technician position, laid off two full-time investigators/Regulatory Agents, and left one part-time Investigator/Regulatory Agent position vacant. (Post Aff. ¶ 15.) Subsequently, a number of race dates were restored at the various race tracks, however, the Racing Commission's budget was not increased and staff – permanent, part-time, and contract – remained reduced. (Post Aff. ¶ 15.)

Plaintiffs Jeff Dye's and Tammie Erskine's positions were two of the twelve positions that were eliminated from the ORC budget after the May 5, 2009, $1.4 million budget cut. (Post Aff. ¶ 17.) This budget reduction came at the beginning of the busiest and costliest portion of the 2009 racing season. The resulting 70% reduction in the remaining race dates for the year by Commissioner White's June 2, 2009 Order further reduced working

47

opportunities for Stewards, veterinarians, licensing clerks, and laborers.  (Post Aff. ¶ 17.)

Defendants White and Post identified Plaintiffs Dye and Erskine as the Harness

Stewards to be terminated and based their decision on the following:

1. After the race dates were reduced by 70%, there was no longer enough work for five Harness Stewards.  There was only enough work for three. If more than three were retained, none would be able to make an adequate living and the situation would have been unsustainable.

2. Defendant Post had an agreement with the Thoroughbred Stewards at the beginning of the year as to how many days they would be provided in order to come to Michigan for the racing season.  Even though Defendant Post could no longer honor that agreement in full and had to reduce their work days, he had to provide them with a certain minimum number of days in order to retain their expertise in Michigan for the duration of the season.   Defendant Post could not operate the Thoroughbred race track without them.

3. The two Thoroughbred Stewards – Mr. Parker and Mr. Garrison – had the requisite skills, certifications and experience to oversee racing at a Thoroughbred race track such as Pinnacle Race Course.  Plaintiffs Dye and Erskine did not.  When Plaintiffs Dye and Erskine had previously filled in at a Thoroughbred track, they worked with at least one and sometimes two experienced Thoroughbred Stewards.

4. It was Defendant Post's opinion that, out of the five full-time Harness (or Standardbred) Stewards – Plaintiffs Hall, Perttunen, Dye, Erskine, and non-plaintiff O'Hare – Plaintiffs Dye and Erskine were less competent than the other Harness Stewards in terms of skills that were most important to be successful in a Steward position.

   Plaintiff Dye lacked the necessary writing skills and had few computer skills, failed to complete assignments on a timely basis and demonstrated a lack of personal organization and follow-up on assignments.  Dye also demonstrated poor judgment in some steward decisions, actively undermined management decisions with the other employees, and generated complaints from the industry regarding his demeanor.

48

Plaintiff Erskine was the least experienced of the Harness Stewards. In addition, Erskine often had difficulty comprehending and following simple instructions, repeatedly resisted management direction, was openly hostile toward management, actively undermined management decision making and credibility with the other ORC staff, and generated more complaints regarding her antagonistic demeanor and unfair decision making than the other four Harness Stewards combined. Erskine failed to collaborate effectively with other team members in decision making; and in fact, one of the other Harness Stewards asked not to work with her anymore.

Also, Plaintiffs Erskine's and Dye's close personal relationship created problems in the work place because it affected their credibility and decision making when working together on the three-person Stewards' panel, damaged the perception of integrity both for them and the ORC, and was the source of repeated complaints from the industry. At least two of the track managers in the industry specifically requested that Plaintiffs Dye and Erskine not be assigned to their race tracks, which created additional scheduling difficulties.

(Post Aff. ¶ 17.)

The Court addresses Plaintiff Erskine's claim first. As discussed above, Plaintiff Erskine denied that she engaged in political speech or publicly voiced or displayed her affiliation or association with the Republican Party. Accordingly, she cannot establish the first element of her § 1983 First Amendment retaliation claim. Because she cannot show that she engaged in constitutionally protected First Amendment activity of which Defendants had knowledge, Plaintiff Erskine cannot establish the causal element of her claim. *See Eckerman*, ___ F.3d at ___, 2010 WL 5140625 at *5. Even if Plaintiff Erskine had presented evidence that she engaged in protected speech in 2005, that speech is too attenuated from her termination in June 2009 to support a finding of causation. *See Mills*, 276 F. App'x at 419 (affirming the district court's finding that a two-year gap between the plaintiff's protected speech and his subsequent termination to be "'too attenuated' to

49

support a finding of causation.").

Moreover, even if Plaintiff Erskine could establish her prima facie case, her deposition testimony and other evidence does not refute Defendants' legitimate, nonpolitical reasons for her termination.  For example, although Plaintiff Erskine denies that she ever heard complaints from Defendants, the horsemen, or her fellow Stewards about her and Dye voting as a block or about Erskine's judging, she admits that she and Dye once had a sexual relationship, continued to be close personal friends, and often worked together on the same shift at the same race track.  (Erskine Dep. at 99-106.)  Erskine also admits that she was critical of Defendants' policies and decisions and admits that she discussed her criticisms with Defendants White and Post.  (Erskine Dep. at 60-61, 71-72.)

As to Plaintiff Dye, the temporal causal connection between Dye's political speech in support of DeVos's candidacy in October 2006 and his termination in June 2009 is far too attenuated to support a finding of causation.  *See Mills*, 276 F. App'x at 419.  Moreover, even if Plaintiff Dye were able to establish the required causal connection, Defendants provide unrefuted evidence that legitimate, nonpolitical reasons motivated their decision to terminate Dye in June of 2009.  For example, Plaintiff Dye concedes that starting in 2007 the ORC, like all Michigan agencies, faced and was addressing its budget crisis.  (Dye Dep. at 92; *see also* Hall Dep. at 15, 124, 154-55.)  Moreover, he does not refute Plaintiff Erskine testimony that he lacked computer skills.  (Erskine Dep. at 106-07.)            Contrary to the argument in their Response, Defendants' deposition testimony does not support Plaintiff Erskine's and Dye's arguments that, prior to their termination, Defendants considered them to be satisfactory employees.  When asked at his deposition whether he thought Plaintiffs

50

Dye and Erskine were satisfactory employees, Post testified that Erskine did some things well, and some things not so well and that sometimes Dye was a satisfactory employee and sometimes not.  (Post Dep. at 35.)  He explained that, because they were contractual employees and not civil service employees, there was no performance appraisal process for their job performance.  (Post Dep. at 35.)  Although Post issued counseling memos for Plaintiffs Hall and Perttunen – for being unprepared for a Steward's hearing and for Hall in connection with a complaint that on one occasion he smelled like he had been drinking while testifying at a hearing -- Post admitted that he never issued one for Plaintiffs Dye and Erskine.  (Post 36-40.)  Defendant White also testified that she never wrote up Plaintiffs Dye or Erskine (or any other Plaintiffs) for any disciplinary infraction while she was the Racing Commissioner because she was not their direct supervisor and admitted that she never instructed Post to write them up.  (White Dep. at 58.)  Just because there are no counseling memos in Plaintiff Erskine's or Plaintiff Dye's personnel files, it is not reasonable to infer from that fact that Plaintiffs were terminated because they engaged in protected First Amendment activity.  Plaintiffs have not come forward with any evidence that refutes Defendants' legitimate, non-political reasons for Erskine's and Dye's termination in June 2009.  "A First Amendment claim is not a wrongful termination claim." *Wasson*, 203 F.3d at 662.

## IV.  Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 31, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 31, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager